UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Chromcraft Revington, Inc., _et al._[1]<br>Debtors. | Chapter 11<br><br>Case No. 15-10482 (KG)<br><br>(Joint Administration Requested) |

DECLARATION IN
SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Samuel A. Kidston, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am the Chief Executive Officer (the "CEO") of Chromcraft Revington, Inc. ("Chromcraft") and Sport-Haley Holdings, Inc. ("Holding"), the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or "Companies").

2. As CEO, I am familiar with the Companies' day-to-day operations, business, financial affairs, books and records.

3. Chromcraft, which has been struggling under the weight of heavy secured debt, intends to maximize the value of its secured creditors' collateral to satisfy those secured obligations through one of more transactions and use the proceeds to pay the secured and other obligations of Chromcraft.

4. Holding is a Delaware corporation and holding company with corporate offices formerly located at 10 Tower Office Park, Suite 419, Woburn, Massachusetts 01801.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (1) Chromcraft Revington, Inc. (8094), and (2) Sport-Haley Holdings, Inc. (0885). The location of the Debtors' corporate headquarters is 200 Union Boulevard, Suite 400, Lakewood, Colorado 80228.

5.      Chromcraft is a Delaware corporation and a wholly owned subsidiary of Holding with offices located at 1 Quality Lane, Senatobia, Mississippi, 38668.

6.      On March 5, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").  The Debtors continue to operate their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed by the Office of the United States Trustee.

7.      Together with the filing of this Declaration (the "Declaration"), the Debtors filed a motion seeking joint administration of the Debtors' chapter 11 cases (the "Cases") pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

8.      Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge of the Debtors' operations and finances and information I have received from the Debtors' advisors.  Any opinions asserted in this Declaration are based upon my experience and knowledge of the Debtors' operations and financial condition.  I am over 18 years old and, if called upon to testify, I could and would competently testify to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

## **INTRODUCTION**

9.      In order to enable the Debtors to minimize the adverse effects of the commencement of these Cases on their business and to ensure that their reorganizational goals can be implemented with limited disruption to their operations, the Debtors request various types of relief in certain "First Day" motions (each, a "First Day Motion" and collectively, the "First Day Motions"), filed herewith.  The First Day Motions seek relief aimed at, among other things,

(a) preserving customer relationships; (b) maintaining vendor confidence; (c) maintaining employee morale; (d) ensuring the smooth continuation of the Debtors' cash management systems and other business operations; (e) securing the postpetition availability of cash necessary to continue the Debtors' operations; and (e) establishing certain administrative procedures to facilitate a smooth transition into chapter 11.  The achievement of the aforementioned goals will be critical to the success of these Cases and the Debtors' reorganization efforts.

10.     To familiarize the Court and other interested parties with the Debtors and the relief the Debtors seek on the first day of these Cases, Part I of this Declaration sets forth the information regarding the nature of the Debtors' businesses and a concise statement of the circumstances leading to the commencement of these Cases.

11.     Part II of this Declaration describes the First Day Motions. I have read, and certify the contents of, each First Day Motion and believe that the relief sought therein (i) is necessary to preserve and maximize the value and productivity of the Debtors' operations, (ii) is integral to the successful reorganization of the Debtors, (iii) serves the best interests of the Debtors, the Debtors' estates and the Debtors' creditors, and (iv) with respect to all non-administrative matters, is necessary to avoid immediate and irreparable harm.

## PART I

### A.     Company History, Organization, and Structure

12.     Holding is a holding company and the sole shareholder of Chromcraft.

13.     Holding's common stock is traded on the OTC Pink Marketplace under the SPOR symbol.  Holding's common stock is held by approximately 178 holders of record under CUSIP number 84917J104.  The following stockholders hold more than five percent of the issued and outstanding common stock of Holding: Fredric M. Doehring (approximately 13%); Sems Diversified Value LP (approximately 10%); Trebor C. Brown (approximately 7%); Sean PL

Gavin (approximately 5%); and Timothy Stabosz (approximately 5%). I directly hold approximately 4.88% of the equity in Holding. Further, members of my family and businesses with whom I am affiliated hold additional equity in Holding.

14. Chromcraft is a Delaware corporation incorporated in 1992 and is a wholly-owned subsidiary of Holding.[2] Until approximately May 2014, Chromcraft engaged in the design, import, manufacture of residential and commercial furniture primarily marketed in the U.S. Chromcraft wholesales its residential furniture products under Chromcraft®, Cochrane®, Peters-Revington®, and CR Kids & Beyond® primary brands and sells its commercial furniture under the Chromcraft® brands. Prior to the Petition Date, Chromcraft sourced furniture from overseas suppliers, with domestic contract specialty facilities, and operated a manufacturing facility for its commercial furniture and motion-based casual dining furniture in Mississippi. Chromcraft markets and sells its residential furniture primarily to independent furniture retailers and regional furniture chains. Chromcraft markets and sells its commercial furniture primarily to office furniture dealers, wholesalers, distributors, furniture rental stores, and contract customers, who in turn historically have sold these products to federal, state, and local government entities.

15. Largely due to economic realities in the furniture industry and unfavorable trends, prior to the Petition Date, Chromcraft started to wind down its business, limit expenses and maximize value to its creditors and stakeholders. To that end, approximately eight months ago, Chromcraft ceased production at its facilities and began marketing and selling inventory and other assets.

---

[2] In 1946, T. L. Peters founded the Peters Manufacturing Company in Delphi, Indiana for the production of novelty wall racks. A year later, George Revington joined the company, and in 1958, the company's name was changed to Peters-Revington. In April 1992, Peters-Revington Furniture and Chromcraft Corporation were joined to form Chromcraft.

16. Through its prepetition marketing efforts Chromcraft received two offers for its assets and entered into two separate asset purchase agreements. Through an asset purchase agreement with Arts And Crafts Industries Ltd., Chromcraft seeks to sell substantially all of its intellectual property assets and, potentially, other *de-minimis* assets and enter into a lease for approximately 100,000 square feet of space in Mississippi. Through an asset purchase agreement with Myron Bowling Auctioneers, Inc., Chromcraft seeks to sell substantially all of its FF&E. Given that Chromcraft's last production of furniture was almost a year ago and the fact that Chromcraft received no other offers for these assets, Chromcraft seeks Court approval of these sales. While both sales are being brought before the court as "private" sales, Chromcraft will entertain higher offers should such offers be received by Chromcraft prior to the sale hearing.

17. In addition, Chromcraft has and continues to actively market its two distribution and warehousing facilities for sale. Its Senatobia, Mississippi facility sits on 52 acres of land and includes approximately 310,000 square feet of manufacturing space, 212,000 square feet of warehouse space and 33,500 square feet of office space.

18. Chromcraft's Delphi, Indiana, facility consists of seven structures totaling approximately 505,000 square feet of office and multi-purpose use space. The facility sits on a 44.67-acre site, inclusive of approximately 14.17 acres of surplus land.

19. As set forth more fully below, the Chromcraft's workforce includes approximately 8 individuals, which are employed through a temporary employment agency Cornerstone Staffing ("Cornerstone").

20. Liquidity constrains required that Chromcraft finance its accounts receivable and inventory and access third-party secured financing. In connection with Chromcraft's prepetition

restructuring efforts, Chromcraft was required (by their secured lender, Merchant) to employ Jeffrey S. Sockol of Sockol Consulting Group, Inc. as its chief restructuring officer. Mr. Sockol will continue to assist Chromcraft in its sale efforts, albeit in a non-CRO role. Unfavorable conditions in the marketplace, and in particular with respect to the furniture industry, has made Chromcraft's restructuring efforts very challenging.[3]

21. The Debtors filed these Cases in order to allow Chromcraft to maximize the value of its lenders' collateral while minimizing expenses[4].

### B.  Summary of the Debtors' Prepetition Capital Structure

22. As described in more detail below, as of the Petition Date, Chromcraft had outstanding secured debt totaling approximately $9 million and approximately of $2 million in unsecured debt and other obligations. Chromcraft's secured obligations to Merchant Factors Corp. ("Merchant") were incurred primarily in connection with financing arrangements under which the secured party has made loans and advances and provided other financial accommodations for Chromcraft. The unsecured debt is comprised primarily of trade obligations, including certain judgments.

---

[3] On or about March 12, 2014, Chromcraft sold its wholly owned subsidiary business segment operating under the name Executive Office Concepts, Inc. ("EOC"), which in 2013 accounted for more than $1 million in losses. The asset purchase agreement required that, post sale, the seller change the name of EOC to CRI SUB1, INC. For ease of reference, a corporate chart of the Debtors, as well as non-debtor entities, is attached to this Declaration.

[4] Chromcraft marketed its assets since approximately May, 2014. To that end, prior to the Petition Date, Chromcraft reach out and, in some instances contracted with, auctioneers and other parties interested in Chromcraft's assets. Chromcraft's marketing efforts will continue post petition.

**Prepetition Credit Facilities**

C.  **Secured Debt**[5]

   i.  *Merchant Obligations*

23.  Chromcraft and Merchant entered into various agreements dated as of November 8, 2013, through which, *inter alia*, Chromcraft obtained access to additional liquidity through the factoring of certain of its accounts receivables, including advances, and Merchant obtained liens on and security interests in certain of Chromcraft's assets.  In particular, Chromcraft and Merchant entered into the following documents (as amended from time to time, the "Chromcraft Loan Documents"):

   (a)  Discount Factoring Agreement (the "Chromcraft Factoring Agreement");

   (b)  Inventory Supplement to Factoring Agreement, Security Interest in Inventory Under Uniform Commercial Code, (the "Inventory Supplement"); and

   (c)  (i) the Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing, with respect to certain real property located in Delphi [Carroll] County, in the State of Indiana (the "Indiana Mortgage"), and (ii) the Deed of Trust, Security Agreement and Assignment of Rents and Leases, with respect to certain real property located in Tate County, in the State of Mississippi (the "Mississippi Deed" and, together with the Indiana Mortgage, the "Mortgages");

24.  To secure its obligations under the above-referenced documents and in exchange for factoring of its accounts receivables and cash advances, Chromcraft granted to Merchant a lien on and security interest in substantially all of its assets, including Accounts, Books and Records, Inventory, Equipment[6], and Intangibles (as each term is defined in the Chromcraft

---

[5] Nothing contained herein constitutes an admission or acknowledgment that any claims, liens or security interests described and identified in this Declaration are valid, enforceable, perfected, allowable, or not subject to disputes, counterclaims, or offsets.

[6] Merchant's liens on the Equipment are junior to prior perfected liens, if any.

Factoring Agreement). Chromcraft also granted Mortgages[7] to Merchant. As of the Petition Date, approximately $8 million remains outstanding under the Chromcraft Factoring Agreement (the "Chromcraft Merchant Obligations").

25.  Through a Guaranty dated November 8, 2013, Holding guaranteed the Chromcraft Merchant Obligations.[8] The Chromcraft Merchant Obligations are also guaranteed by a non-debtor affiliate of Chromcraft.

26.  By Personal Guarantee and Waiver, dated April 3, 2014, I guaranteed the Chromcraft Merchant Obligations.

### D.  Unsecured Debt

27.  As of the Petition Date, the Debtors have aggregate unsecured debts totaling approximately $2 million which include amounts due and owing for sales commission, duties and customs, inventory purchases, trade debt and employee-related expenses.

### E.  Pending Litigation

28.  As of the Petition Date, the Debtors, primarily Chromcraft, were parties to numerous actions pending in state and federal courts. The Debtors intend to review those actions and, if appropriate, remove them to the Bankruptcy Court.

## PART II

## FIRST DAY MATTERS

### A.  Relief Sought In The First Day Pleadings

29.  It is critically important for the Debtors to maintain the loyalty and goodwill of, among other constituencies, their vendors, employees, and customers. To that end, the Debtors filed the First Day Pleadings seeking relief intended to allow the Debtors to effectively transition

---

[7] Up to $4.8 million in the Chromcraft Merchant Obligations is secured by the Mississippi Deed.
[8] On November 8, 2013, I also executed a Validity Guaranty in favor of Merchant in connection with the Chromcraft Factoring Agreement.

into chapter 11 and minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.  Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer significant adverse, immediate, and irreparable consequences.

30. Several of the First Day Pleadings request authority to pay certain prepetition claims.  I understand that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, and as set forth below, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Accordingly, certain requests for relief will be deferred for consideration at a later hearing.

31. Concurrently with the filing of these Cases, the Debtors filed the following First Day Pleadings:

    i.    Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a), Fed. R. Bankr. P. 1015 and Del. Bankr. L.R. 1015-1 Approving Joint Administration of Cases and Granting Related Relief

    ii.    Motion of the Debtors for Entry of an Order Pursuant to Fed.R. Bankr. P. 1007(b) and (c) and Del. Bankr. L.R. 1007-1(a) Extending the Time Within Which the Debtors Must File Their Schedules and Statements of Financial Affairs

    iii.    Debtors' Motion for an Order Authorizing the Debtors to (i) Maintain Their Existing Bank Accounts and Cash Management System; (ii) Continue to Use Their Existing Business Forms and Records; and (iii) Maintain Existing Investment Practices

    iv.    Debtors' Motion for Entry of Interim and Final Orders (i) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (ii) Deeming Utility Companies to Have Adequate

                Assurance of Future Payment and (iii) Establishing Procedures for Resolving Requests for Additional Assurance

    v.    Debtors' Motion for Entry of a Final Order (a) Authorizing the Payment of Prepetition Sales, Use, Income, Property, Real Estate, and Other Taxes, and Governmental Charges, (b) Authorizing Banks and Financial Institutions to Honor and Process All Checks and Wire Transfers Related Thereto, and (c) Granting Related Relief

    vi.    Debtors' Motion for Entry of an Order Authorizing the Debtors to (a) Pay Certain Prepetition Wages, Reimbursable Employee Expenses and Other Employee Compensation Expenses and (b) Honor Certain Employee Benefits and (c) Granting Related Relief

    vii.    Application For An Order Appointing Kurtzman Carson Consultants Llc As Claims And Noticing Agent For The Debtors Pursuant To 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) And Local Rule 2002-1(f)

    viii.    Motion For Interim And Final Orders I) Authorizing (A) The Debtor To Obtain Postpetition Financing On A Senior Secured Superpriority Basis Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, And 364; (B) To Utilize Cash Collateral Pursuant To 11 U.S.C. § 363; (II) Granting Adequate Protection To Prepetition Secured Lender Pursuant To 11 U.S.C. §§ 361, 363 And 364; (III) Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(b); And (IV) Granting Related Relief (the "DIP Motion")

32.    With respect to the DIP Motion, given the lack of continued operations and Chromcraft's financial position, Chromcraft was unable to secure additional liquidity on an unsecured basis or on terms better than those proposed by Merchant. As such, I believe that the relief sought in the DIP Motion is in the best interest of the Debtors and their stakeholders.

## **CONCLUSION**

33.    The facts stated therein and described in the First Day Pleadings are true and correct to the best of my information and belief, are incorporated into this Declaration by reference as if fully raised herein. I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations, and constitutes a critical element in successfully restructuring the Debtors' business.

34. The relief sought in each of the First Day Pleadings will minimize the adverse effects of the Cases on the Debtors and result in maximum creditor recoveries. I believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate effectively as debtors-in-possession.

35. Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as this Court deems just and proper.

[*Remainder of page intentionally left blank*]

I certify under penalty of perjury that, to the best of my knowledge, information and belief, the statements set forth in this Declaration are true and correct.

**Chromcraft Revington, Inc.** *et al.*
*Chapter 11 Debtors and Debtors in Possession*

Dated: March 6, 2015    By: */s/ Samuel A. Kidston*
Samuel A. Kidston as Chief Executive Officer

**Organizational Chart**



*Non-debtor